No. 23-5676

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

THOMAS CLARDY,

*Petitioner-Appellee,*

v.

ZAC POUNDS, WARDEN

*Respondent-Appellant.*

Appeal from the United States District Court
Middle District of Tennessee, Nashville Division
Case No. 3:19-cv-1098 (Trauger, J.)

## BRIEF OF PETITIONER-APPELLEE THOMAS CLARDY

Jessica M. Van Dyke
Jason M. Gichner
THE TENNESSEE INNOCENCE PROJECT
700 Craighead Street, Suite 300
Nashville, Tennessee 37204
Tel: (615) 581-7230

Scott D. Gallisdorfer
BASS, BERRY & SIMS PLC
150 Third Avenue South
Suite 2800
Nashville, Tennessee 37201
Tel: (615) 742-7926

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-5676          Case Name: Clardy v. Pounds

Name of counsel: Scott D. Gallisdorfer

Pursuant to 6th Cir. R. 26.1, Thomas Clardy
*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No

## CERTIFICATE OF SERVICE

I certify that on          December 15, 2023          the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Scott D. Gallisdorfer

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT REGARDING ORAL ARGUMENT ....................................... viii

STATEMENT OF THE ISSUES ........................................................... 1

INTRODUCTION ........................................................................... 2

STATEMENT OF THE CASE .............................................................. 3

    I.     Clardy is convicted in state court. ..................................... 4

        A.    The jury convicts based on Kent's identification. ................ 4

        B.    The TCCA affirms on direct appeal. ..................................... 14

    II.    Clardy seeks post-conviction relief in state court. ......................... 14

        A.    Clardy presents new evidence, including expert testimony on eyewitness identifications. .............................. 15

        B.    The trial court denies post-conviction relief. ........................ 20

        C.    The TCCA affirms the denial of post-conviction relief. ....... 21

    III.    The district court grants Clardy's federal habeas petition. .......... 21

SUMMARY OF THE ARGUMENT ....................................................... 24

STANDARD OF REVIEW ................................................................. 26

ARGUMENT ................................................................................. 27

    I.     Trial counsel's performance was deficient. ..................................... 27

i

A.  By failing to request funding for an expert, trial counsel's performance fell well short of prevailing professional norms. ...................................................29

B.  Precedent supports the district court's deficiency analysis. ......................................................................31

C.  The State's contrary arguments lack merit. ...........................35

II.  Trial counsel's deficient performance prejudiced Clardy's defense. ...............................................................................40

A.  AEDPA does not bar relief because the TCCA unreasonably applied *Strickland*'s prejudice standard.........41

B.  The district court correctly concluded that prejudice is "abundantly clear." ..................................................47

CONCLUSION ........................................................................................55

CERTIFICATE OF COMPLIANCE ....................................................56

DESIGNATION OF RELEVANT DOCUMENTS ...........................57

CERTIFICATE OF SERVICE ...............................................................59

# TABLE OF AUTHORITIES

## Cases

*Bigelow v. Williams,*
   367 F.3d 562 (6th Cir. 2004) .............................................................................42

*Burton v. Renico,*
   391 F.3d 764 (6th Cir. 2004) .............................................................................26

*Clardy v. State,*
   2018 WL 5046032 (Tenn. Ct. Crim. App. Oct. 17, 2018) ...................... *passim*

*Dorch v. Smith,*
   105 F. App'x 650 (6th Cir. 2004).......................................................................52

*Dugas v. Coplan,*
   428 F.3d 317 (1st Cir. 2005) .............................................................................39

*Est. of Barney v. PNC Bank,*
   714 F.3d 920 (6th Cir. 2013) .............................................................................38

*Ferensic v. Birkett,*
   501 F.3d 469 (6th Cir. 2007) ................................................................... *passim*

*Ferensic v. Birkett,*
   451 F. Supp. 2d 874 (E.D. Mich. 2006)..............................................................33

*Guilmette v. Howes,*
   624 F.3d 286 (6th Cir. 2010) (en banc) .............................................................27

iii

*Hardy v. Chappell*,
  849 F.3d 803 (9th Cir. 2016) ................................................................ 28, 44, 45

*Harrington v. Richter*,
  562 U.S. 86 (2011) ................................................................ 29, 46, 47

*Hinton v. Alabama*,
  571 U.S. 263 (2014) ................................................................ 34, 35

*House v. Bell*,
  547 U.S. 518 (2006) ................................................................ 42

*Jells v. Mitchell*,
  583 F.3d 478 (6th Cir. 2008) ................................................................ 45

*Johnson v. Rapelje*,
  2017 WL 8159213 (6th Cir. Sep. 28, 2017) ................................................................ 52

*Jones v. United States*,
  262 A.3d 1114 (D.C. 2021) ................................................................ *passim*

*Marcrum v. Luebbers*,
  509 F.3d 489 (8th Cir. 2007) ................................................................ 40

*Morgan v. Trierweiler*,
  67 F.4th 362 (6th Cir. 2023) ................................................................ 36

*Panetti v. Quarterman*,
  551 U.S. 930 (2007) ................................................................ 41

*Perkins v. McKee*,
  411 F. App'x 822 (6th Cir. 2011) ................................................................ 34

iv

*Perry v. New Hampshire,*
    565 U.S. 228 (2012) ........................................................................54

*Rayner v. Mills,*
    685 F.3d 631 (6th Cir. 2012) ...........................................................28

*Rogers v. Mays,*
    69 F.4th 381 (6th Cir. 2023) (en banc) ..................................... 45, 46

*Schlup v. Delo,*
    513 U.S. 298 (1995) ........................................................................42

*Sears v. Upton,*
    561 U.S. 945 (2010) (per curiam) ...................................................45

*State v. Clardy,*
    2009 WL 230245 (Tenn. Ct. Crim. App. Feb. 2, 2009) ..................14

*Stermer v. Warren,*
    959 F.3d 704 (6th Cir. 2020) ...........................................................39

*Strickland v. Washington,*
    466 U.S. 668 (1984) ................................................................passim

*United States v. Bartlett,*
    567 F.3d 901 (7th Cir. 2009) ...........................................................49

*United States v. Moore,*
    786 F.2d 1308 (5th Cir. 1986) .........................................................49

*United States v. Nolan*,
  956 F.3d 71 (2d Cir. 2020)........................................................ *passim*

*United States v. Smithers*,
  212 F.3d 306 (6th Cir. 2000) .................................................... *passim*

*Watkins v. Sowders*,
  449 U.S. 341 (1981) ...................................................................48

*Wiggins v. Smith*,
  539 U.S. 510 (2003) ............................................................. 44, 55

*Williams v. Taylor*,
  529 U.S. 362 (2000) ......................................................... 26, 43, 44

*Wilson v. Sellers*,
  138 S. Ct. 1188 (2018) ...............................................................47

*Young v. Conway*,
  698 F.3d 69 (2d Cir. 2012)...........................................................54

## Statutes

28 U.S.C. § 2254(d) .....................................................................26

## Rules

Tenn. S. Ct. R. 13 § 5............................................................. 35, 37

**Other Authorities**

Brandon L. Garrett, Convicting the Innocent: Where Criminal Prosecutions
 Go Wrong (2011) ...............................................................................49

## STATEMENT REGARDING ORAL ARGUMENT

Clardy agrees with the State that oral argument is warranted. This appeal involves a complex factual record and presents significant issues of constitutional law. Oral argument will help the Court evaluate the parties' opposing contentions. *See* 6 Cir. R. 34(a).

## STATEMENT OF THE ISSUES

The district court granted Clardy's habeas petition and vacated his state court convictions. It held that Clardy's trial counsel rendered ineffective assistance in violation of his Sixth Amendment right. The issues presented are:

1. Whether Clardy's trial counsel performed deficiently by failing to present, or even request funding for, expert testimony about the well-established reliability problems with eyewitness identifications.

2. Whether the Tennessee Court of Criminal Appeals unreasonably applied clearly established federal law when it held that Clardy could not establish prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984), because the expert testimony would not have "negat[ed]" the eyewitness identification.

3. Whether Clardy was prejudiced by trial counsel's deficient performance where a single eyewitness identification was the only meaningful evidence supporting his convictions.

**INTRODUCTION**

"[E]yewitness misidentification accounts for more false convictions in the United States than any other factor." *Forensic v. Birkett*, 501 F.3d 469, 478 (6th Cir. 2007). As this Court has recognized, jurors place too much weight on eyewitness identifications because their limitations are counterintuitive and jurors do not understand the factors that affect their reliability. *See id.* at 482-83. Experts often help. Expert testimony about the reliability problems with eyewitness identifications "is now universally recognized as scientifically valid and of aid [to] the trier of fact." *Id.* at 482 (internal quotation marks omitted).

Here, the petitioner, Thomas Clardy, was convicted of murder and sentenced to life in prison based solely on a single, cross-racial eyewitness identification. Even though that identification was the only meaningful evidence of his guilt, his trial counsel did not present testimony from an identification expert. In fact, Clardy's trial counsel did not even bother to request court funding for such an expert, even though she knew an expert was needed and made some effort to find one. She later testified that she "should have gotten an expert," but just "decided to go ahead" without one.

Below, the magistrate judge and the district court *both* correctly held that to be deficient performance. Both also held that trial counsel's failure prejudiced Clardy's defense. As an expert testified at a state court post-conviction hearing, the identification here was riddled with reliability issues.

Had jurors fully understood those issues, the verdict very likely would have been different. Rather than recognize this reality, the state court insisted Clardy had not shown prejudice because he had not "negat[ed]" the identification. The state court's analysis was unreasonable, and the district court's holding was correct. This Court should affirm the habeas grant.

## STATEMENT OF THE CASE

Late at night on July 29, 2005, three black men—all wearing hooded sweatshirts—pulled up to an auto body shop near Nashville. When they left a short time later, three people had been shot: Kirk, Kent, and Melissa Clouatre. Kirk and Kent were twin brothers who ran the body shop. Melissa was Kirk's wife. Kirk died at the scene. Kent and Melissa survived, but suffered serious injuries.

At first, neither of the surviving victims could identify any of the three assailants. Kent, who is white, told police he could not even *describe* them, other than "male" and "black." (Transcript, RE 10-2, PageID # 1139.) Nearly a month later, however, Kent picked Thomas Clardy out of a six-pack photo array and identified him as the man who shot Kirk and Melissa. Although police also showed Melissa a photo array that included Clardy's picture, she picked out someone different. Still, based solely on Kent's identification, Clardy was charged with the shooting. A Tennessee jury convicted him.

Neither of Clardy's supposed accomplices have ever been identified. Besides Kent's identification, no other evidence links Clardy to the scene.

3

The State admitted at trial that it did not know why he would have wanted to kill the Clouatres. And Clardy has steadfastly maintained his innocence for nearly two decades.

## I.    Clardy is convicted in state court.

Clardy was indicted on one count of first-degree murder, two counts of attempted first-degree murder, and three counts of reckless endangerment. (Indictment, RE 10-1, PageID ## 934-41.) He pleaded not guilty to all counts. (Minutes, RE 10-1, PageID # 981.)

### A.    The jury convicts based on Kent's identification.

Clardy's trial took place July 9-11, 2007. (*Id.* at PageID ## 981-87.) Kent's belated identification of Clardy was essentially the State's entire case.

**Accounts of the Events.** Melissa was the State's first witness. She told the jury that her husband, Kirk, worked at the auto body shop with his twin brother, Kent. (Transcript, RE 10-2, PageID ## 1025-26.) According to Melissa, on July 29, 2005, she drove to the body shop around 10 pm with her two daughters and another girl to pick up Kirk from work. (*Id.* at PageID ## 1031-32.) When they arrived, Kirk heard a noise coming from Melissa's car and wanted to take a look. (*Id.* at PageID ## 1032-33.) Kirk pulled it into the shop's garage. (*Id.* at PageID ## 1033-35.) The three girls remained in the car while Melissa stood nearby. (*Id.* at PageID # 1035.)

Melissa told the jury that just then, another car pulled up outside the shop and "[t]hree guys got out." (*Id.* at PageID ## 1037-38.) Two of the men

walked into the shop and briefly spoke to Kirk and Kent.  (*Id.* at PageID ## 1038-40.)  Melissa could not hear their conversation, but she heard Kirk ask Kent, "where is your gun?" (*Id.* at PageID ## 1040-41.)  Melissa thought the conversation may have related to a Chevrolet Monte Carlo also parked in the garage.  (*Id.* at PageID ## 1029, 1033, 1040.)

According to Melissa, after Kirk spoke with the two men for a few minutes, he walked back to her car to continue his work.  (*Id.* at PageID # 1041.)  Melissa then heard Kent yell, "Kirk, no!"  (*Id.*)  She heard four or five gun shots and saw Kirk fall to the ground.  (*Id.* at PageID # 1043.)  Melissa tried to hide, but the man who shot Kirk then turned and "looked right at [her]."  (*Id.* at PageID # 1056.)  He shot her in the chest, and then left the garage.  (*Id.* at PageID ## 1044-46.)  Kent would eventually claim that this man—who shot both Kirk and Melissa—was Clardy.

When Melissa got up, the assailants were gone.  (*Id.* at PageID ## 1047-48.)  She checked on the children, Kent, and Kirk.  (*Id.*)  Kent told her Kirk was dead, and Melissa called 911.  (*Id.* at PageID # 1047.)  When police arrived, Melissa was flushing marijuana down a toilet.  (*Id.* at PageID ## 1060-61.)

Kent confirmed to the jury that he and Kirk were both working at the body shop on the night of the shooting.  (*Id.* at PageID # 1076.)  Kirk was working underneath Melissa's car when the three assailants pulled up.  (*Id.* at PageID ## 1079-80.)  Kent testified that he was standing outside and that

one of the men rolled down the window and asked him if the Monte Carlo was inside. (*Id.* at PageID ## 1080-81.) When Kent said that it was, all three men got out of the car and walked toward the garage. (*Id.* at PageID # 1082.) Two of them, including the driver, went inside. (*Id.* at PageID ## 1082-83, 1086.) Kent heard gunshots roughly thirty seconds later and saw the driver shoot Kirk. (*Id.* at PageID ## 1082-84.) The third man—who was still outside the garage with Kent—then shot Kent in the arm. (*Id.* at PageID ## 1087-88.) Kent tried to run, but the same man shot him again in the back. (*Id.* at PageID # 1088.) The three men then returned to their car and drove away. (*Id.* at PageID ## 1092-93.)

**Descriptions of the Suspects.** Melissa originally told police that *four* black men participated in the shooting, but she testified at trial that there were only three. (*Id.* at PageID # 1057.) And she could describe only two of them to the jury. She testified that the man who shot her was "about 5'7", 150 to 160 pounds and in his late 20s." (*Id.* at PageID # 1062.) She said he was wearing a white t-shirt. (*Id.*) She described the second man as "male, black, tall 6'2" not chunky, [with a] blue thing on his head." (*Id.* at PageID # 1063.) Melissa testified she never saw the third man. (*Id.*)

Although Melissa testified she was "facing" the man who shot her, and that he had "looked right at [her]," she did not identify him as Clardy. (*Id.* at PageID ## 1044-45, 1056.) She also testified that she had been unable to

6

make an identification when the police showed her a photo array that included Clardy.[1]  (*Id.* at PageID # 1055.)

At first, Kent could provide police no meaningful description of the assailants.  (*See id.* at PageID # 1139.)  At trial, however, Kent identified Clardy as the driver of the car and told the jury he shot Kirk and Melissa. (*Id.* at PageID ## 1099-1100.)  Kent testified that he had previously seen Clardy around the neighborhood and had occasionally interacted with him. (*Id.* at PageID ## 1083-84, 1100-01, 1113-14.)  According to Kent, Clardy went by the initial "T."   (*Id.* at PageID # 1084.)  Kent testified that "T" was "wearing a hood" during the shooting and "[ran] in the shop really quick." (*Id.* at PageID # 1102.)  He admitted that he only saw "the side of his face," but claimed to recognize "T" anyway.  (*Id.*)  Kent testified that "T" was carrying a "semiautomatic .40 caliber" gun.  (*Id.* at PageID # 1108.)

Kent described the second man—who shot Kent outside the garage— as "a little bit heavy set … little shorter" with "gold, I guess, in his teeth" and "diamonds … set sideways when he gritted at me."  (*Id. at* PageID # 1087.) Kent could not describe the third man, but told the jury that all three of the assailants were wearing hooded sweatshirts.  (*Id.* at PageID ## 1115-16.)

---

[1] Evidence later presented at the state court post-conviction hearing revealed that Melissa had not just been unable to identify Clardy—she instead picked out someone different.  (Transcript, RE 10-18, PageID ## 2191-92).  The jury did not learn this fact.

The jury also heard from Cynthia Quirouette, a police detective who was the first lead investigator. Detective Quirouette testified that she interviewed Kent on the night of the shooting. Although Kent did mention someone named "T," he told her "T"'s name might be "Darrel." (Transcript, RE 10-3, PageID # 1255.) Later, however, he told Detective Quirouette he had *not* seen "T" at the crime scene. (*Id.* at PageID # 1256.) Further complicating Kent's account, another detective, Danny Satterfield, testified that Kent told him "T" had tattoos, a fact also reflected in Detective Satterfield's report. (*Id.* at PageID # 1213.) Yet there is no dispute that Clardy has never had any tattoos. When Kent was confronted with this discrepancy at trial, he denied ever mentioning tattoos and could not explain why Detective Satterfield said he did. (Transcript, RE 10-2, PageID # 1128.)

**Descriptions of the Vehicle.** As for the assailants' car, Melissa testified that it was "dark" or "green" with an "oval back," and was either "a [Ford] Taurus or a [Mercury] Sable." (*Id.* at PageID # 1037.) Melissa had consistently given police similar descriptions of the car in the days and weeks following the shooting. (*Id.* at PageID # 1165; Transcript, RE 10-3, PageID # 1263.)

Originally, Kent's description of the car was completely different. Kent—who ran an auto body shop and was familiar with car makes and models—told police immediately after the shooting that the assailants' car was an '87 Buick Century, which hardly resembles a Taurus or Sable.

(Transcript, RE 10-2, PageID # 1139.)  Kent repeated this description several times over the following weeks, at one point describing the car to police as a 1984 to 1986 Buick Century or Celebrity that was silver or gunmetal grey, and then later as a "bluish gray '84 [or] '86 model Buick with six square taillights."  (Transcript, RE 10-3, PageID # 1213; Transcript, RE 10-18, PageID ## 2175-77.).  At trial, however, Kent abruptly changed course.  He instead told the jury it was a "forest green Ford Taurus."  (Transcript, RE 10-2, PageID # 1084.)  When confronted by his earlier descriptions of the vehicle as a grey or silver Buick, Kent again claimed that he could not recall making those statements and could not explain why the police reports repeatedly said that he did.  (*Id.* at PageID # 1112.)

**Police Testimony and Other Evidence.**  Detective Quirouette, the original lead investigator, testified about her efforts to identify the man Kent supposedly knew as "T."  She told the jury that she could not do so for weeks after the shooting.  (Transcript, RE 10-3, PageID ## 1264-65, 1279, 1284.)  According to Detective Quirouette, Kent did not cooperate with her efforts.  She testified that he treated her disrespectfully and repeatedly interfered with the investigation.  (*Id.* at PageID ## 1265-67.)  Another detective involved in the case confirmed Kent's refusal to cooperate and speculated he may have feared being charged with drug crimes.  (*Id.* at PageID ## 1225-26.)

After Kent refused to sit for more interviews with Detective Quirouette, she was replaced by Detective Satterfield.  (*Id.* at PageID ## 1225-

26, 1228.) He identified Clardy as a suspect just three days later, but has never explained how he did so. (*Id.* at PageID ## 1204-05, 1210-12.) On August 23, 2005—roughly three weeks after the shooting—Detective Satterfield showed Kent a six-pack photo array that included Clardy. (*Id.* at PageID ## 1204-06.) Kent identified Clardy for the first time as the driver of the assailants' car and the man who shot Kirk and Melissa. (*Id.*) Although at least a portion of the identification procedure was video-recorded, Kent testified at trial that he picked Clardy out of the array *before* police began recording. (Transcript, RE 10-2, PageID # 1115.) And indeed, the video, which was not introduced at trial, shows Kent telling police he had "already seen" Clardy just as the array is being handed to him by Detective Satterfield. (Transcript, RE 10-17, PageID # 2075.)

Besides Kent's belated identification, the State introduced no other evidence tying Clardy to the scene. A police crime scene investigator testified about various items found there, including shell casings, live rounds, projectile fragments, and a 9 mm gun found under Kirk's elbow. (Transcript, RE 10-3, PageID ## 1181-1200.) But he told the jury that Clardy's fingerprints were not on any of these items. (*Id.* at PageID ## 1199-1200.) Detective Satterfield testified that police believed the 9 mm gun belonged to Kirk. (*Id.* at PageID # 1207.) He also told the jury that police had conducted ballistics testing on the shell casings and projectile fragments, but had not

identified matches to any other guns.  (*Id.* at PageID # 1208.)  Nor did the State introduce any DNA evidence.

**Clardy's Defense.**  Clardy's defense was mistaken identification. His counsel sought to highlight inconsistencies in the two surviving victims' accounts as well as the lack of any other evidence tying him to the scene. Clardy also sought to present testimony from two alibi witnesses: his then-wife, Roylessha Mason, and her friend, Shakisha Thompson.

Mason testified that she was pregnant at the time of the shooting and just been ordered to bedrest by her doctor.  (*Id.* at PageID # 1301.)  She testified that she was home with Clardy that night.  (*Id.* at PageID ## 1303-05.)  She remembered the night specifically because, around 7:30 or 8:00 pm, her friend, Shakisha Thompson, picked up Mason's son to take him bowling. (*Id.* at PageID # 1305-08.)  According to Mason, Clardy was home when Thompson brought her son back later that night.  (*Id.* at PageID # 1308.)

Mason tried to testify that Clardy was at home with her the entire evening and never left.  (*Id.* at PageID # 1307.)  But the State objected that Clardy had not provided the proper alibi notice for Mason.  So the Court instructed the jury to disregard this testimony.[2]  (*Id.* at PageID ## 1307-08.)

---

[2] The State elicited similar testimony from Mason on cross-examination, but this came only a few minutes after the Court had already told the jury that it could not consider the testimony when offered on direct.  (*See* Transcript, RE 10-3, PageID # 1311.)

Still, Mason testified that Clardy has never had tattoos or gold teeth, which meant he would not have matched the descriptions that Kent gave police. (*Id.* at PageID ## 1310-11.)  Mason acknowledged that the couple owned a green Mercury Sable, but explained that it had blown a gasket and was inoperable at the time of the shooting.  (*Id.* at PageID ## 1309-10.)  She told the jury it was later towed from their apartment complex.  (*Id.*)  The State offered nothing to rebut this testimony.

Mason's friend, Shakisha Thompson, confirmed that she had picked up and dropped off Mason's son on the night of the shooting.  Thompson testified that she arrived at Mason and Clardy's home around 7:30 or 8:00 pm and Clardy was there.  (*Id.* at PageID ## 1322-23.)  When she returned, sometime between 10:30 and 11:00 pm, Clardy met her at the door.  (*Id.* at PageID # 1324.)  Thompson told the jury Clardy was "calm," did not seem nervous, and was neatly dressed in a shirt, shorts, and a pair of "[g]randpa slippers."  (*Id.* at PageID ## 1324-25.)

The only other witness Clardy's trial counsel called was Detective Quirouette.  Although the State's entire case hinged on Kent's identification, Clardy's counsel did *not* present any expert testimony related to eyewitness identifications.

**Closing Arguments and Jury Verdict.**  The State's closing argument focused almost entirely on Kent's identification of Clardy.  Although the State had vaguely referred to several possible disputes that "T" might have

12

had with Kent or Kirk, the prosecutor frankly admitted that the State could not identify any coherent motive, telling the jury, "we don't know why [Clardy] did it." (*Id.* at PageID # 1332.) The prosecutor argued that Clardy and "two of his friends" were responsible for the shooting, but did not even hazard a guess as to who these "friends" were. (*Id.* at PageID # 1333.) The State argued that Mason, Clardy's wife, was "not credible." (*Id.* at PageID # 1336.) And although the prosecutor admitted that her friend, Shakisha Thompson, did "appear[] credible," he argued that she could not provide Clardy an alibi because she was out with Mason's son when the shooting occurred. (*Id.* at PageID # 1337.) According to the prosecutor, that gave Clardy a "window to commit the crime."[3] (*Id.*)

In her own closing argument, Clardy's trial counsel again sought to highlight the discrepancies in Kent's testimony, stressing his original claim that "T" had tattoos and was driving a grey Buick. (*Id.* at PageID ## 1340-42, 1344.) She also reminded the jury that Kent testified he had only seen "T" from the side and that "T" had tried to conceal his face with the hood of his

---

[3] This "window" was at most only a few minutes. Melissa called 911 at 10:48 pm. (*See* Transcript, RE 10-18, PageID # 2248.) Yet Thompson testified that she saw Clardy at home, "calm" and neatly dressed, sometime between 10:30 and 11:00 pm. (Transcript, RE 10-3, PageID ## 1324-25.) Evidence introduced at the post-conviction hearing showed that the shop was roughly ten miles, or fifteen minutes, from Clardy's home. (Transcript, RE 10-18, PageID ## 2249.)

sweatshirt. (*Id.* at PageID ## 1344-46.) Still, without any expert testimony on which to rely, Clardy's trial counsel could not tell the jury how often eyewitnesses get it wrong. Nor was she able to highlight the scientific research that has associated many of the features of Kent's identification with diminished reliability. Perhaps most importantly, without expert testimony, Clardy's counsel had no evidentiary basis for informing the jury that an eyewitness's confidence in an identification is known to have little correlation with accuracy.

Even without a motive, any identified accomplices, or any physical evidence tying Clardy to the scene, the jury convicted him on all counts. He received a mandatory life sentence. (Trial Record, RE 10-1, PageID ## 988-93.)

**B.     The TCCA affirms on direct appeal.**

The Tennessee Court of Criminal Appeals (the "TCCA") affirmed Clardy's convictions. *State v. Clardy*, 2009 WL 230245 (Tenn. Ct. Crim. App. Feb. 2, 2009). The Tennessee Supreme Court denied discretionary review. *See id.*

**II.     Clardy seeks post-conviction relief in state court.**

Clardy filed a petition for post-conviction relief in state court. He asserted several claims of ineffective assistance of trial counsel, as well as actual innocence. (Amended Petition, RE 10-14, PageID ## 1734-52.) Among these claims was that Clardy was denied effective assistance of counsel

because his trial counsel failed to present expert testimony on eyewitness identifications. Trial counsel did not even request funding for such testimony from the court. (*Id.* at PageID ## 1741-42.)

## A. Clardy presents new evidence, including expert testimony on eyewitness identifications.

The trial court held a hearing on the post-conviction petition in September 2016. Clardy presented a wide array of new evidence.

**Expert Testimony.** Most relevant to this appeal was testimony from Dr. Jeffrey Neuschatz, a forensic psychologist and professor at the University of Alabama at Huntsville. (Transcript, RE 10-17, PageID ## 2043-91.) Dr. Neuschatz is an expert on human memory, particularly as it relates to eyewitness identifications. He has published widely on various psychological factors that influence the reliability of such identifications. Dr. Neuschatz reviewed the trial testimony, police reports, and other case materials and testified about how those factors could have affected the reliability of Kent's identification of Clardy.

Dr. Neuschatz first told the court about studies showing that human memory is less reliable when memories are imprinted during fluid, complex, or stressful situations. In those circumstances, he explained, the mind tends to "fill in the pieces … to tell consistent stories," even if those pieces are not entirely accurate. (*Id.* at PageID # 2051.) As time passes, the mind continues to "edit and change" memories to "fill in the gaps," again in ways that may

15

not reflect reality. (*Id*.) Dr. Neuschatz agreed that the shooting Kent witnessed was an example of a "complex" and "high-stress" event. (*Id.* at PageID # 2052-57.)

Dr. Neuschatz also testified that "[l]onger exposure times"—the length of time a witness has to view a face, for instance—"are better for memory." (*Id.* at PageID # 2053.) This was potentially important because Kent testified that "T" ran into the body shop "really quick" and that he had only "seen the side" of "T"'s face. (Transcript, RE 10-2, PageID # 1102.) Kent also testified in detail about the gun "T" was carrying. According to Dr. Neuschatz, based on a concept known as "weapon focus," identifications tend to be less reliable when a gun is present. (Transcript, RE 10-17, PageID ## 2057-60.) That is because the gun acts as a "magnet" for the witness's attention, pulling it away from the person's face. (*Id.* at PageID # 2059.)

As for the cross-racial nature of Kent's identification, Dr. Neuschatz confirmed that many scientific studies have shown that "people have more difficulty identifying people from different races than they do identifying people from their own race." (*Id.* at PageID ## 2062-63.) According to Dr. Neuschatz, people are around 1.6 times more likely to make an error when trying to identify someone of a different race than their own. (*Id.* at PageID # 2064.) Head coverings only compound this difficulty. Dr. Neuschatz told the court that accuracy "suffers dramatically" when a witness tries to identify someone who was wearing a hat, hood, or similar clothing that

covered the hairline.  (*Id.* at PageID # 2064-65.)  Kent, of course, testified that Clardy had "tried to hide" his identity by wearing a hooded sweatshirt. (Transcript, RE 10-2, PageID # 1102.)

Dr. Neuschatz also testified about factors external to an event that influence memory.  First, he explained that receiving post-event information can "dramatically change someone's memory."  (Transcript, RE 10-17, PageID ## 2066-67.)  Dr. Neuschatz described studies showing significant changes to a witness's recollection of an event based even on a single word later used by someone else to describe the event.  And he agreed that a witness's memory could "absolutely" be detrimentally affected by later conversations with police officers or other witnesses.  (*Id.* at PageID # 2067.)

In addition, Dr. Neuschatz described a phenomenon known as "unconscious transference."  (*Id.* at PageID ## 2067-68.)  That occurs when a witness confuses or transfers details of one memory into another memory from a similar time or context.  Based on this concept, Dr. Neuschatz agreed that Kent's alleged familiarity with Clardy from around the neighborhood could have caused him to confuse Clardy for the man who shot Kirk and Melissa.  (*Id.* at PageID ## 2069-70.)  So, while the State had argued that Kent's professed familiarity with Clardy made his identification *more* credible, Dr. Neuschatz suggested it may have had the opposite effect.

Dr. Neuschatz likewise threw cold water on the notion that Kent's confidence in his identification lent it any particular credibility.  According

to Dr. Neuschatz, psychology research has repeatedly shown that an eyewitness's confidence in an identification has near "zero" correlation with accuracy, at least when the identification is not made *immediately* after the event.  (*Id.* at PageID # 2070-71.)  Here, Kent did not identify Clardy until more than three weeks after the shooting.

Finally, Dr. Neuschatz opined on the procedure police used when Kent first identified Clardy from a photo array.  Dr. Neuschatz testified that he had watched the video recording of the procedure and believed it contradicted best practices in at least two respects: first, it was not double-blind; and second, police did not appear to ask Kent about his confidence in the identification.  (*Id.* at PageID ## 2073-75.)  Dr. Neuschatz also noted that the video showed Kent saying he had "already seen" the photo of Clardy before the array was handed to him, an anomaly that Dr. Neuschatz could not explain.  (*Id.* at PageID # 2075-77.)

**Trial Counsel's Testimony.**  Pat Snyder, Clardy's trial counsel, also testified at the post-conviction hearing.

Snyder told the court that Clardy was initially a retained client, and that she had talked with one of his relatives about possibly financing an eyewitness identification expert.  (Transcript, RE 10-18, PageID # 2204.) According to Snyder, the Administrative Office of the Courts "was not paying expert witness's fees that were being billed" and "there was difficulty in trying to get some expert witnesses that we could even afford, or one who

would be willing to take the state fees if we got [Clardy] declared indigent."
(*Id.* at PageID ## 2204-05.)  Snyder recalled discussing with Clardy that "the only evidence [the State] had … was [Kent's] identification," and she expressly agreed that "I should have gotten – I apparently should have gotten an expert witness."  (*Id.* at PageID # 2205.)  She described making efforts to find an expert, but testified that she eventually just "decided to go ahead" to trial without one.  (*Id.*)

Snyder admitted that she never filed a motion requesting court funding for an expert.  (*Id.* at PageID # 2206.)  Explaining that she "wanted to find one first," she described calling various experts on a list maintained by the Tennessee Association of Criminal Defense Lawyers.  (*Id.*)  She also looked for an expert out-of-state.  But Snyder testified that she "couldn't find one that either we could afford or would be willing to come down and do it for what the State of Tennessee was paying."  (*Id.*)  Snyder did not identify what that amount was, nor did she explain how she could have known what the State would pay without ever asking for funding in the first place.  And, critically, Snyder admitted that she didn't know "any reason why the Court wouldn't have approved" funding had she asked.  (*Id.* at PageID # 2213.)

Snyder heard Dr. Neuschatz's testimony, and she told the Court that "some of the juries that I've dealt with would have hated him."  (*Id.* at PageID # 2233.)  Still, Snyder testified it was possible that similar expert testimony would have changed the verdict, and she admitted that "I should

have got a trial continuance to try to get an expert somewhere and I didn't."
(*Id.* at PageID # 2241.)

**Other Exculpatory Evidence.**  In support of his other ineffective assistance claims, Clardy also presented a wide variety of additional exculpatory evidence.[4]  This evidence included the alibi testimony from Clardy's then-wife that the court had instructed the jury to disregard at trial. (Transcript, RE 10-18, PageID ## 2285-88.)  Clardy also presented brand new ballistics testing results that connected two of the guns used at the body shop to a pair of cousins with whom Clardy has no connection.  (*See generally* Petition, RE 1, PageID ## 23-27.)  These cousins had later used the guns when committing another murder and participating in an armed cocaine sale.  One of the cousins had tattoos and unique gold teeth with clear cutouts, closely mirroring Kent's original descriptions of the shooters.

## B.    The trial court denies post-conviction relief.

The state trial court denied Clardy's petition for post-conviction relief. (Order, RE 10-16, PageID ## 1980-88.)  Rejecting the eyewitness expert claim, the court held that Clardy could not establish prejudice.  (*Id.* at PageID # 1983.)  The court did not address whether trial counsel's failure to fully pursue expert testimony amounted to deficient performance.

_____

[4] This additional evidence is described in far greater detail in Clardy's petition.  (*See* Petition, RE 1, PageID ## 23-27, 32-38, 40-42.)

**C.     The TCCA affirms the denial of post-conviction relief.**

The state appellate court affirmed.  *See Clardy v. State*, 2018 WL 5046032 (Tenn. Ct. Crim. App. Oct. 17, 2018) ("*Clardy II*").  Addressing the ineffective assistance claim tied to the lack of an eyewitness identification expert, the TCCA first summarized the post-conviction testimony of Dr. Neuschatz and Clardy's trial counsel.  But the court then offered just two sentences of analysis, addressing only the prejudice element of the claim:

> Dr. Neuschatz could not opine as to the correctness of Kent's identification.  Merely giving a jury more information to consider without negating the identification does not establish a reasonable probability, sufficient to undermine the outcome, that the result of the proceeding would have been different.

*Id.* at *7.  Like the trial court, the TCCA declined to address whether trial counsel's performance was deficient.  The Tennessee Supreme Court again denied discretionary review.

**III.    The district court grants Clardy's federal habeas petition.**

Clardy then filed a timely federal habeas petition in the Middle District of Tennessee.  (Petition, RE 1, PageID ## 1-84.)  Clardy's petition asserted several ineffective assistance claims, including that trial counsel was ineffective because she failed to obtain or seek funding for an eyewitness identification expert.  The State answered the petition and opposed relief.  (Answer, RE 12, PageID ## 2849-73.)

The magistrate judge recommended that Clardy's petition be granted. (Report & Recommendation, RE 25, PageID ## 2931-2971.)  The magistrate judge concluded that Clardy's trial counsel performed deficiently because she failed to request funding for an eyewitness identification expert.  (*Id.* at PageID # 2953.)  In the magistrate judge's view, that failure prejudiced Clardy's defense because Kent's identification of Clardy was the "central issue at trial" and, without expert testimony, "the jury had no basis beyond defense counsel's word to suspect [its] inherent unreliability."  (*Id.* at PageID ## 2960-61.)

The district court agreed.  It adopted the magistrate judge's report and recommendation, over the State's objection, in a 19-page opinion. (Memorandum, RE 34, PageID ## 3064-3082.)  The district court determined that trial counsel's performance was deficient because she "recognized that [Kent's] eyewitness identification was effectively the *only* evidence the government had against Clardy, and she acknowledged … that she 'apparently should have gotten an expert witness,'" but "admitted that she never actually requested funding from the state." (*Id.* at PageID # 3072.)  The court noted that it could not "imagine" any legitimate strategic reason for failing to seek funding for an expert whose testimony trial counsel herself "believed to be critical to the case."  (*Id.*)

The district court also agreed that trial counsel's failure prejudiced Clardy's defense.  First, the court held that the TCCA's prejudice analysis

was not a reasonable application of the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984). The court explained that while the TCCA "paid lip service" to *Strickland*'s 'reasonable probability' standard, it actually *applied* a far more rigorous one. (Memorandum, RE 34, PageID # 3078.) That is because the TCCA suggested that Clardy could establish prejudice only if the expert testimony "negat[ed]" Kent's identification. The district court viewed that analysis as tantamount to requiring definitive proof of actual innocence, which was "contrary to *Strickland*." (*Id*.)

Analyzing prejudice de novo, the district court concluded there was "*more* than a reasonable probability" that testimony from an expert like Dr. Neuschatz would have changed the jury's verdict. (*Id.* at PageID # 3080.) Noting the "exceedingly weak" evidence of Clardy's guilt, the district court explained that expert testimony would likely have changed the outcome by offering the jury "a scientific, professional perspective" on Kent's identification "that no other witness provided." (*Id.* at PageID ## 3080-81.) Noting the "copious evidence in the record establish[ing] numerous inconsistencies in Kent Clouatre's testimony," the court concluded that expert testimony "would have been particularly helpful" to inform the jury

"*why* the eyewitness identification was inherently unreliable." (*Id.* (cleaned up).) That made *Strickland* prejudice "abundantly clear."[5] (*Id.* at 3082.)

The district court conditionally granted a writ of habeas corpus and ordered that Clardy be released or retried within 180 days. (Order, RE 35, PageID # 3083.) The State appealed.[6]

## SUMMARY OF THE ARGUMENT

The district court correctly held that Clardy's trial counsel was constitutionally ineffective and properly granted habeas relief. In reaching the opposite conclusion, the state court did not reasonably apply the prejudice standard from *Strickland v. Washington*, 466 U.S. 668 (1984).

---

[5] The district court did not address the remaining ineffective assistance claims, which the magistrate judge had recommended denying. Because the district court granted habeas relief, it determined those remaining claims were "moot." (Memorandum, RE 34, PageID # 3082.) While not addressed by the district court, those claims were fully briefed below and any one of them may provide an alternative basis for affirming the judgment. That said, if this Court believes those claims need be resolved, the better course would be to remand to the district court so that it may address them first.

[6] The district court stayed its judgment, but ordered the State to release Clardy from custody pending appeal. (Order, RE 50, PageID # 3196.)

**I.** Clardy's trial counsel performed deficiently by failing to obtain or even request funding for expert testimony on the reliability problems associated with eyewitness identifications.

**A.** The TCCA did not address *Strickland*'s deficient performance prong. It instead resolved the claim solely on the prejudice prong. So this court must assess trial counsel's performance de novo, without deference to the state court.

**B.** The district court correctly held that trial counsel's performance fell below an objective standard of reasonableness. Trial counsel recognized that Kent's identification of Clardy was the State's entire case. For that reason, she sought to obtain an expert to testify about eyewitness identifications. But despite making some effort to find an expert whom Clardy could afford, trial counsel never requested funding from the court. That was based purely on her own speculation that the court would not have provided the necessary funding. Because the identification was central to the case, failing to even *ask* the court for funding fell woefully short of professional norms.

**II.** Trial counsel's deficient performance prejudiced Clardy's defense.

**A.** The TCCA's prejudice analysis is not entitled to deference. The TCCA unreasonably applied *Strickland*'s prejudice standard by concluding Clardy could not show prejudice solely because expert testimony would not

have "negat[ed]" Kent's identification. That effectively required conclusive proof of actual innocence. *Strickland*'s prejudice standard is not nearly so demanding, and the TCCA's analysis was, therefore, unreasonable.

**B.** The district court correctly held that *Strickland* prejudice here is "abundantly clear." This case turned on a single eyewitness identification, and many factors associated with diminished reliability were present here. Because these issues are counterintuitive, expert testimony was essential to explain them to the jury. Had an expert testified at trial, there is more than a reasonable probability of a different verdict.

## STANDARD OF REVIEW

**I.** This court reviews de novo a district court's grant of a writ of a habeas corpus. *Burton v. Renico*, 391 F.3d 764, 770 (6th Cir. 2004).

**II.** The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this case. Under AEDPA, when a state court holds that trial counsel was not ineffective, a federal court may grant habeas relief only if that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

A state court's decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court unreasonably applies clearly established federal law if

it "identifies the correct governing legal principle" from the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

This court looks to "the last reasoned state court opinion" to determine whether these requirements are satisfied. *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010) (en banc). Here, that is the TCCA's decision affirming the trial court's denial of post-conviction relief. *See Clardy II*, 2018 WL 5046032.

## ARGUMENT

The district court correctly held that Clardy is entitled to habeas relief because he did not receive the effective assistance of trial counsel guaranteed by the Sixth Amendment. Under *Strickland*, a criminal defendant is denied effective assistance if (i) counsel's performance was deficient; and (ii) the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. Both requirements are satisfied here. As the district court recognized, the TCCA unreasonably applied clearly established federal law when it concluded otherwise.

## I. Trial counsel's performance was deficient.

Clardy's trial counsel performed deficiently by failing to present expert testimony on eyewitness identifications. Despite recognizing the importance of such testimony for Clardy's defense, trial counsel did not even request funding from the court. Nothing excuses that failure.

**1.** As the State concedes, this Court must assess counsel's performance de novo without deference to the state court. *See* Opening Br. at 37. The TCCA did not reach *Strickland*'s deficient performance prong; it instead rejected Clardy's ineffective assistance claim based solely on the prejudice prong. *Clardy II*, 2018 WL 5046032, at *6-7. So, as to this Court's review of counsel's performance, AEDPA plays no role. *See Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012) ("AEDPA deference does not apply to review of [a] *Strickland* prong not relied upon by the state court.").

**2.** To establish deficient performance, Clardy must show "that counsel's representation fell below an objective standard of reasonableness" as measured by "prevailing professional norms." *Strickland*, 466 U.S. at 688. To be sure, that standard is a deferential one.[7] Courts must avoid relying on "the distorting effects of hindsight" to "second-guess" reasonable "tactical" and "strategic" choices, even when those decisions have gone awry. *Id.* at 689-90. But the Supreme Court has also made clear that courts should not reflexively defer to *any* purportedly "strategic" decision, especially one not

_____

[7] The State's brief suggests that this case is subject to "doubly" deferential review. *See* Opening Br. at 22-23. Not so. "Doubly" deferential review refers to applying AEDPA deference *on top of* the deference already owed to counsel's choices when analyzing *Strickland*'s deficiency prong. AEDPA deference does not apply to the deficiency prong here, so there is no double deference. *See, e.g., Hardy v. Chappell*, 849 F.3d 803, 825 (9th Cir. 2016).

supported by adequate investigation.  *See id.* at 690-91.  And, as to expert testimony, the Supreme Court has recognized that "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence."  *Harrington v. Richter*, 562 U.S. 86, 106 (2011).

A.    **By failing to request funding for an expert, trial counsel's performance fell well short of prevailing professional norms.**

The deficient performance standard is more than satisfied here.  As the TCCA recognized, Kent's eyewitness identification was "the only thing linking [Clardy] to the crime."  *See Clardy II*, 2018 WL 5046032, at \*4.  From the outset, therefore, it was obvious that the jury's verdict would turn entirely on the perceived reliability of that identification.

1.    That put Clardy in a precarious position.   As this Court has recognized, "juries are unduly receptive to identification evidence and are not sufficiently aware of its dangers."  *United States v. Smithers*, 212 F.3d 306, 312 n.1 (6th Cir. 2000); *see also United States v. Nolan*, 956 F.3d 71, 75 (2d Cir. 2020) ("Eyewitness identification testimony is notoriously prone to error."). "Jurors tend to overestimate the accuracy of eyewitness identifications because they often do not know the factors they should consider when analyzing the testimony."  *Smithers*, 212 F.3d at 312 n.1.  Expert testimony is critical in cases like this one to help mitigate that danger.  Because "many aspects of perception and memory are not within the common experience of

most jurors" and are "counter-intuitive," this Court has "recognized the expediency of expert testimony to address these complex issues and to inform jurors fully of the issues they must decide." *Id.* at 316.

**2.** Clardy's trial counsel herself recognized that expert testimony was needed. She admitted that she "should have gotten an expert witness," and testified that the kind of testimony Dr. Neuschatz offered could have changed the verdict. (Transcript, RE 10-18, PageID ## 2205, 2241.) She also described the efforts she made to find an expert. Those efforts confirm that she understood the need for one at the time, not just in hindsight. Still, trial counsel did not obtain an expert, explaining that she could not find one whom Clardy could afford, or who would accept the fees that she expected the Administrative Office of the Courts would pay. (*Id.* at PageID # 2206.) But trial counsel admitted she never requested funding from the court. (*Id.*) And she admitted that she "should have got a trial continuance to try to get an expert somewhere," but did not. (*Id.* at PageID # 2241.) Trial counsel *speculated* about whether the court would provide the necessary funding, but never bothered to confirm whether that speculation was correct.

In essence, trial counsel did not undertake the basic investigation—filing a motion for funding with the court—necessary to reach an informed conclusion about whether adequate funding was available. Given how crucial an expert witness was to Clardy's defense, that lack of basic investigation fell woefully short of prevailing professional norms, as the

30

district court correctly recognized. In a case where a single eyewitness identification was the *only* meaningful evidence of guilt—and where trial counsel herself recognized the need for expert testimony to rebut that identification—there is no reasonable justification for not even *asking* the court for funding. Trial counsel barely even tried to offer one—she instead testified that she just "decided to go ahead with it." (Transcript, RE 10-18, PageID # 2205.) That is textbook deficient performance.

### B. Precedent supports the district court's deficiency analysis.

**1.** Supporting that conclusion, several other courts have held that a criminal defense lawyer performed deficiently in similar circumstances. In *United States v. Nolan*, the Second Circuit confronted a case where a jury had convicted the defendant "relying almost entirely on eyewitness identifications." 956 F.3d at 75. Although that case featured *four* eyewitness identifications, the court observed that all four "bore significant indicia of unreliability"—including many of the same indicia that Dr. Neuschatz testified about here. *Id.* Still, trial counsel chose not to call or even consult an expert, and instead tried to impeach the identifications through cross-examination and closing argument. The Second Circuit panel unanimously held that was deficient performance. As the court explained, "the eyewitness testimony was sufficiently unreliable in ways not readily

apparent to a lay jury."[8]  So, while the court acknowledged that "*Strickland* ordinarily does not require defense counsel to call any particular witness," it concluded that under the circumstances, "counsel could not render effective assistance without input from an expert."  *Id.* at 82.

The District of Columbia Court of Appeals reached a similar conclusion in *Jones v. United States,* 262 A.3d 1114 (D.C. 2021).  There, too, the defendant was convicted based mostly on eyewitness identifications.  Trial counsel, however, did not call an expert witness "because he thought the identification evidence was already weak."  *Id.* at 1121.  He instead chose to "highlight[] the inconsistencies and inaccuracies" in the witnesses' testimony himself.  *Id.* at 1121.  Despite that strategic justification, the court held that trial counsel performed deficiently.  The court explained that "many jurors have basic misunderstandings about the way memory works and about specific circumstantial factors that affect the reliability of eyewitness identifications."  *Id.* at 1125.  Jurors, the court emphasized, are "decidedly *not* as competent as the expert in considering and weighing

---

[8] Like in this case, the identifications in *Nolan* were cross-racial; the suspects were wearing head coverings; they were carrying weapons; the witnesses were victims who were under stress; several weeks had elapsed between the crime and when the defendant was first identified from a photo array; and the "police employed highly irregular procedures in pursuing the witnesses' identification."  *Nolan*, 956 F.3d at 80-81.

eyewitness evidence to draw the appropriate and necessary conclusion." *Id.* at 1128 (internal quotation marks omitted). For that reason, the court unanimously concluded that the "situation" presented there—where "the government's case hinged primarily on … eyewitness testimony"—was "one in which professional norms require counsel to explore … calling an expert witness to testify." *Id.* So too here.

Another district court within this circuit has also reached that same conclusion. *See Forensic v. Birkett*, 451 F. Supp. 2d 874 (E.D. Mich. 2006), *aff'd on other grounds*, 501 F.3d 469 (6th Cir. 2007). *Forensic* was similar to this case in that trial counsel there recognized the need for expert testimony to address the eyewitness identifications, which were "the crucial basis for [the petitioner's] conviction." *Id.* at 884. Much like in this case, however, trial counsel did not take the necessary steps to ensure such testimony could be presented—there, he did not timely disclose the expert's report. Although trial counsel was still able to "challenge inconsistencies" in the eyewitnesses' testimony through cross-examination and highlight "inherent problems" with the identifications through attorney argument, the district court still held that trial counsel's failure was deficient performance. *Id.* at 883-85. After all, "without [the expert's] testimony, there was no evidence to support counsel's argument." *Id.*

**2.** The State observes that "[n]o precedent establishes that defense counsel must call an expert witness about the problems with eyewitness

testimony … or risk falling below the minimum requirements of the Sixth Amendment." Opening Br. at 38 (quoting *Perkins v. McKee*, 411 F. App'x 822, 833 (6th Cir. 2011)).[9] And that may be true as a general rule. But the decisions discussed above make clear there are at least *some* cases involving eyewitness identifications where the failure to pursue expert testimony *does* amount to deficient performance. This is one such case. Indeed, this is an even easier case than *Nolan* and *Jones* because trial counsel actually recognized the need for expert testimony. Trial counsel's main error was failing to take the basic step necessary to request funding from the court.

**3.** The Supreme Court's decision in *Hinton v. Alabama*, 571 U.S. 263 (2014), further supports the district court's conclusion. In *Hinton*, as here, trial counsel recognized the need for an expert witness (in that case, an expert to testify about toolmark evidence). Unlike Clardy's counsel, however, trial counsel in *Hinton* sought funding from the court. And the court granted the request, but subject to a purported statutory cap. Because counsel could not find a qualified expert willing to accept the amount the

---

[9] As the district court observed, *Perkins* was an unpublished opinion where this Court noted "there [was] nothing … suggesting that [an expert] witness was imperative." 411 F. App'x at 833. That is likely because *Perkins* involved far more *non*-eyewitness-identification evidence than was present here. For instance, the petitioner had been arrested near the scene, tried to flee, and an accomplice already in police custody tried to signal to him. *Id.* at 825. It was not a case that turned solely on an eyewitness identification.

court had authorized, he went forward with an underqualified expert who was easily discredited at trial. In fact, however, the trial court was mistaken; no statutory cap existed. Instead, the relevant statute authorized funding for expenses "reasonably" incurred. Because trial counsel was unaware of that provision, the Supreme Court held he performed deficiently by "fail[ing] to request additional funding." *Id*. at 274.

If trial counsel's performance was deficient in *Hinton*, Clardy's counsel's performance was all the more so here. While trial counsel in *Hinton* did not request *enough* funding, Clardy's counsel did not request *any.* And, unlike Clardy's counsel, the defense lawyer in *Hinton* did at least find some expert to testify, even if that expert was underqualified. Clardy's counsel, by contrast, just "decided to go ahead with it"—without any expert at all. (Transcript, RE 10-18, PageID # 2205.)

## C.     The State's contrary arguments lack merit.

The State's brief offers several rejoinders, but they are unpersuasive.

**1.** The State first argues that trial counsel could *not* have requested funding because she had not identified an expert. *See* Opening Br. 40-43. For this argument, the State relies on the text of the relevant state court rule, which requires a party seeking funding for an expert witness to identify the expert by name in the motion and specify the proposed hourly rate. *See* Tenn. S. Ct. R. 13 § 5(b)(2). According to the State, trial counsel had not identified an expert and so could not have filed a motion.

35

The State has forfeited this argument. The State never cited the state court rule in the state courts, and it never once argued that trial counsel could not have moved for funding on that basis. Even more importantly, the State never raised the argument in *this* action until *after* the magistrate judge recommended granting Clardy's petition. (*See* Obj. to Report & Recommendation, RE 28, PageID # 2987.) Indeed, the rule is cited nowhere in the State's answer to the petition. (*See* Answer, RE 12, PageID # 2849-73.) The district court thus correctly held that the argument was not preserved. (Memorandum, RE 34, PageID # 3074); *see also Morgan v. Trierweiler*, 67 F.4th 362, 367 (6th Cir. 2023) ("[I]ssues raised for [the] first time in objections to [a] magistrate judge's report and recommendation are deemed waived.").

Nonetheless, the district court also determined that the forfeited argument failed on the merits, and rightly so. At the post-conviction hearing, Clardy's counsel did *not* say that she could not find an expert willing to testify, just that she could not find one who would accept what she guessed the state would pay. But trial counsel never bothered to confirm how much the state would pay. At a minimum, counsel should have requested adequate funding for at least *one* of the many experts with whom she described speaking, even if she suspected that the court would have

denied the request.[10]    Asking for funding certainly would not have put Clardy in any *worse* position.  It was trial counsel's failure to even make the request that made her performance deficient.

In a related argument, the State now also contends—for the first time on appeal—that counsel could not have requested the necessary funding because the rule provides a maximum hourly rate for psychologists of $150.  *See* Opening Br. at 41-42 (citing Tenn. S. Ct. R. 13 § 5(d)(1)(D)).  The State insists, without citing any evidence, that trial counsel could not find an expert willing to accept that hourly rate.  But trial counsel never said what hourly rate the experts with whom she spoke were willing to accept.  Presumably, though, it was something *less* than $150, given trial counsel's testimony that she did not know "any reason why the Court wouldn't have approved" funding.  (Transcript, RE 10-18, PageID # 2213.)  To that point, trial counsel's testimony made clear that her concern was based *not* on whether the court would *approve* an hourly rate—or even total fees—that an expert was willing to accept, but on her speculation about whether the Administrative Office of the Courts would actually *pay* the fees that were

─────────────────────

[10] The rule provides that the court may grant "prior authorization" for funding "in a reasonable amount to be determined by the court."  Tenn. S. Ct. R. 13 § 5(a)(1).

billed.[11]  (*Id.* at PageID # 2204-05.)  As the district pointed out, that is no excuse for failing to request approval for funding in the first place.  In any event, this argument about the maximum hourly rate has also been forfeited by the State because the State did not raise it in the district court.  In fact, the State never even *mentioned* the $150 rate cap below.  *See Est. of Barney v. PNC Bank*, 714 F.3d 920, 925 (6th Cir. 2013) ("In general, we will not review arguments or issues that a party raises for the first time on appeal.").

    **2.**  Trying a different tack, the State next characterizes trial counsel's failure to request funding as some kind of "strategic" decision entitled to deference.  According to the State, trial counsel made a reasonable tactical choice to attack the identification through cross-examination and closing argument rather than expert testimony.  *See* Opening Br. 43-46.  That is pure revisionist history.  Trial counsel unequivocally testified that she recognized the importance of an expert, wanted to find one, and made some efforts to find one.  She abandoned that strategy *only* once she concluded—based on nothing but her own speculation—that the court would not pay fees that any expert would accept.  Her testimony thus makes clear that she did not make

---

[11] Nor does anything in trial counsel's testimony suggest that the *hourly rate* was even the focus of her concern, rather than the total fees.  The State's assertion that trial counsel "could not find an expert willing to testify at the rate that the State would reimburse" (Opening Br. at 42) is thus nothing but sheer speculation.

a "strategic" choice to forgo expert testimony in favor of other means of impeachment. *See, e.g., Dugas v. Coplan*, 428 F.3d 317, 333 (1st Cir. 2005) (criticizing the argument that "counsel made a tactical decision to forego expert consultation" as being "inconsistent with how counsel actually proceeded" and "more a post-hoc rationalization of counsel's conduct than an accurate description").

Even if the decision not to request the necessary funding can itself be characterized as a "strategic" decision, it certainly was not a reasonable one. As the district court observed, there is *no* legitimate tactical reason that would justify not at least *asking* for funding for an expert witness that trial counsel herself thought was important to Clardy's defense. And, without bothering to confirm whether adequate funding would be available, trial counsel's decision to instead rely on cross-examination and other means for impeaching the identification cannot be considered an informed strategic choice. Once trial counsel concluded an expert witness was worth pursuing, basic professional norms required her to at least ask the court for the necessary funding. *See, e.g., Stermer v. Warren*, 959 F.3d 704, 739 (6th Cir. 2020) ("In a duel, it might be a reasonable choice to elect a swordfight over pistols, but once you choose the latter, it makes no sense to show up without any bullets.").

**3.**     In one last effort to justify trial counsel's neglect, the State cites her testimony that she listened to Dr. Neuschatz at the post-conviction

hearing and that "some of the juries that [she had] dealt with would have hated" him. Opening Br. at 45 (quoting Transcript, RE 10-18, PageID # 2233). Based on this testimony, the State asserts that trial counsel's "skepticism about Dr. Neuschatz's testimony" was "a perfectly valid reason not to seek an expert." Opening Br. at 46.

The district court correctly dismissed this argument as a "red herring." Trial counsel's personal opinion about Dr. Neuschatz, years after trial, is irrelevant. Her own testimony, after all, was that she did not pursue an expert because she did not believe she could obtain the necessary funding, *not* because she questioned an expert's value. The State cannot prevail by conjuring up strategic rationales that, hypothetically, *could have* motivated counsel's choices at the time of trial, but plainly did not. *See Marcrum v. Luebbers*, 509 F.3d 489, 502 (8th Cir. 2007) ("[W]hen a petitioner shows that counsel's actions actually resulted from inattention or neglect, rather than reasoned judgment, the petitioner has rebutted the presumption of strategy, even if the government offers a possible strategic reason that could have, but did not, prompt counsel's course of action.").

## II. Trial counsel's deficient performance prejudiced Clardy's defense.

Trial counsel's deficient performance prejudiced Clardy's defense. Prejudice here is "abundantly clear," and the TCCA's contrary conclusion was an unreasonable application of *Strickland*. (Memorandum, RE 34, PageID # 3082.)

**A.    AEDPA does not bar relief because the TCCA unreasonably applied *Strickland*'s prejudice standard.**

The TCCA's conclusion that Clardy was not prejudiced by his counsel's failure to seek expert testimony rested on an unreasonable application of *Strickland*'s prejudice standard.   AEDPA therefore does not bar relief, and this Court should evaluate prejudice de novo.   *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, … [a] federal court must then resolve the claim without the deference AEDPA otherwise requires.").

The TCCA's prejudice analysis occupied all of two sentences in its opinion.  The TCCA first noted that "Dr. Neuschatz could not opine as to the correctness of Kent's identification."  *Clardy II*, 2018 WL 5046032, at *7.   It then concluded that "[m]erely giving a jury more information to consider without negating the identification does not establish a reasonable probability … that the result of the proceeding would have been different." *Id*.  That short-shrift analysis was not a reasonable application of *Strickland* for several reasons.

**1.**  First, there is no reasonable basis for the TCCA's suggestion that showing prejudice would require Dr. Neuschatz's testimony to "negat[e]" Kent's identification.  As the TCCA itself recognized, Kent's identification was "the only thing linking [Clardy] to the crime."  *Id.* at *4.  If Kent's

identification was incorrect—if it was someone *other* than Clardy whom he saw—that would necessarily mean Clardy was innocent. So, at least on these facts, "negating" the identification is the same as conclusively proving actual innocence. And yet that is not remotely what *Strickland*'s prejudice standard requires.[12]    *See Strickland*, 466 U.S. at 693-94 (rejecting an "outcome-determinative" standard for assessing prejudice);  *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004) (to show *Strickland* prejudice, a petitioner "need not conclusively demonstrate his 'actual innocence'").

**2.**  The TCCA's analysis ran even further off course when the court suggested Clardy had not shown prejudice because Dr. Neuschatz's testimony would have "[m]erely" given the jury "more information to consider." *Clardy II*, 2018 WL 5046032, at *7. As the district court correctly recognized, giving the jury more information was "exactly the point." (Memorandum, RE 34, PageID # 3078.)  The very purpose of expert

---

[12] Consider the *Schlup* "gateway innocence" standard, which requires showing that it is "more likely than not that no reasonable juror would have convicted" in light of new evidence. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). That standard requires "a stronger showing than that needed to establish [*Strickland*] prejudice." *Id.*  And yet, the Supreme Court has found that higher standard satisfied even where new evidence only "called into question" the proof connecting a petitioner to the crime and some evidence "still supported[ed] an inference of guilt." *House v. Bell*, 547 U.S. 518, 553-54 (2006).

testimony in this context is to provide jurors with more information about how and why eyewitness identifications are unreliable, because such information will likely affect the *weight* that jurors give the identification.[13] When an eyewitness identification is the only evidence of guilt, any change to that weight at least has the *potential* to alter the outcome. The TCCA's reasoning thus reflects a fundamental misunderstanding of how *Strickland*'s prejudice standard works.[14]

**3.** Finally, the district court also correctly observed that the TCCA "clearly did not assess the effect of [trial counsel's] error in light of the totality of the circumstances." (Memorandum, RE 34, PageID # 3079.) When

---

[13] This also explains why the first sentence of the TCCA's prejudice analysis is misguided. By pointing out that Dr. Neuschatz "could not opine as to the correctness" of the identification, the court seemed to suggest that prejudice would exist only if he could. *Clardy II*, WL 5046032, at *7. But "no expert may testify as to what a witness did or did not see." *Smithers,* 212 F.3d at 317 n.3. So, if the TCCA's view were correct, the absence of expert testimony on eyewitness identifications could *never* establish prejudice.

[14] The Supreme Court has itself found *Strickland* prejudice where an attorney's deficient performance deprived jurors of more information to consider—even when that information would not have negated the other relevant evidence. *See Williams*, 529 U.S. at 398 (holding that mitigation evidence counsel failed to present at sentencing "might well have influenced the jury's appraisal" of the defendant's culpability even though that evidence "may not have overcome" or "undermined" the state's evidence).

assessing *Strickland* prejudice, a court "must consider the totality of the evidence before the judge or jury" to determine whether counsel's errors changed "the inferences to be drawn from the evidence" or "alter[ed] the entire evidentiary picture." *Strickland*, 466 U.S. at 695-96. Here, there is no sign that the TCCA did so. Instead, it evaluated prejudice only with reference to whether the expert testimony would have "negat[ed]" the identification itself. Nor is there any indication that the court considered the expert testimony in light of the other extensive evidence of innocence presented at the post-conviction hearing. *See Wiggins v. Smith,* 539 U.S. 510, 536 (2003) ("[W]e evaluate the totality of the evidence—both that adduced at trial *and the evidence adduced in the habeas proceeding[s].*" (emphasis in original) (internal quotation marks omitted)). That error, too, makes the TCCA's application of *Strickland* unreasonable.

**4.** The State's efforts to rehabilitate the TCCA's reasoning are unconvincing. For starters, the State suggests that the TCCA must have applied *Strickland* reasonably because it accurately quoted the *Strickland* standard. *See* Opening Br. at 23-24. As the Supreme Court has explained, however, a state court unreasonably applies clearly established federal law even when it "identifies the correct governing legal principle" from the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "[I]t is the application, not the recitation of a standard that matters for § 2254(d) purposes." *Hardy*

44

*v. Chappell*, 849 F.3d 803, 819 (9th Cir. 2016); s*ee also, e.g., Sears v. Upton*, 561 U.S. 945, 952 (2010) (per curiam) ("Although the Court appears to have stated the proper [*Strickland*] prejudice standard, it did not correctly conceptualize how that standard applies to the circumstances of this case."); *Jells v. Mitchell*, 538 F.3d 478, 491-92 (6th Cir. 2008) (holding that a state court unreasonably applied *Strickland* even though it "correctly identified the *Strickland* standard as the governing federal rule").

**5.** This case is not like *Rogers v. Mays*, 69 F.4th 381 (6th Cir. 2023) (en banc). There, this Court rejected an ineffective assistance claim arising from the sentencing phase of a capital case. The petitioner asserted trial counsel should have presented the sentencing jury what this Court called a "far-fetched" scientific theory to rebut the possibility that he committed rape, which was one of several aggravating factors supporting imposition of the death penalty. The crime of conviction was the grisly murder of a 9-year old girl, and the evidence of the petitioner's guilt was overwhelming. *See id.* at 386-87. Rejecting the ineffective assistance claim, this Court specifically explained that even if the jury had accepted the "far-fetched" theory—and thus discounted the evidence of rape—the jury "would still have been confronted with" many other "highly inflammatory and disturbing facts" that "would have most likely resulted in the same sentence." *Id.* at 392 (internal quotation marks omitted). That is a far cry from this case, where the only evidence of Clardy's guilt was one shaky eyewitness identification,

45

and the evidence counsel failed to provide the jury was well-accepted scientific testimony about related reliability issues.

The State relies on *Rogers* mostly just to chastise the district court for supposedly "flyspeck[ing]" the TCCA's opinion. Opening Br. at 24-25 (quoting *Rogers*, 69 F.4th at 391). In *Rogers*, the state court's opinion at one point suggested the petitioner had not established prejudice because the relevant evidence would not "eliminate or completely discredit" the State's proof of rape. Here, the State analogizes that language to the TCCA's comment about Clardy needing to "negat[e]" the eyewitness identification. The State argues that if the language in *Rogers* did not reflect an unreasonable application of *Strickland*, then neither did the TCCA's analysis here. Critically, however, the language in *Rogers* represented just "four words" in what this Court otherwise described as a "thorough[]" and "careful[]" 75-page opinion that "faithfully applied the *Strickland* prejudice standard." *Rogers*, 69 F.4th 390-92. In contrast, the TCCA's observation here that the expert testimony did not "negat[e]" Mr. Clardy's guilt was not just a "stray thought." *Id. at 391*. It was essentially the TCCA's *entire* prejudice analysis. A federal court does not "flyspeck[]" or "nitpick[]" a state court opinion by zeroing in on the *only* portion of the opinion that analyzes the relevant issue. *Id.* at 393. *Rogers* does not suggest otherwise.

**6.** The State's brief also relies on the Supreme Court's decision in *Harrington v. Richter*, 562 U.S. 86 (2011), including to argue that the district

court "overlook[ed] arguments that would otherwise justify the state court's result." Opening Br. at 27. *Richter*, however, addressed situations where a state court has rejected a claim on the merits without providing any reasons. In that unique circumstance, the Supreme Court held that the state court's adjudication should be considered reasonable if there is *any* reasonable basis that *could have* supported it. But "*Richter* does not control" this case. *Wilson v. Sellers*, 138 S. Ct. 1188, 1195 (2018). Here, the TCCA *did* explain why it concluded Clardy had not established *Strickland* prejudice. And yet that explanation did not reflect a reasonable application of the *Strickland* standard. So, by urging the Court to give the TCCA's result the benefit of all doubt, the State is really asking the Court to ignore what the TCCA actually said. That is not how AEDPA review works. *See id.* at 1190, 1195 (noting that, when a state court has explained its decision, federal courts "focus[]" AEDPA review "exclusively on the actual reasons given" by the state court, not what reasons "could have supported" the decision).

## B. The district court correctly concluded that prejudice is "abundantly clear."

Analyzing *Strickland*'s prejudice prong de novo, the district court correctly held that Clardy was prejudiced by the lack of expert testimony. Any reasonable application of *Strickland*'s prejudice standard compels that conclusion.

**1.** The threshold for showing prejudice in this case is inherently low. Even the State concedes that Kent's identification of Clardy was essentially the only evidence of his guilt. And Kent's testimony was already beset with credibility problems, including the dramatic changes between his testimony at trial and statements he originally made to police. Because the evidence against Clardy was "exceedingly weak" to start, it would not have taken much to change at least one juror's mind. (Memorandum, RE 34, PageID # 3080.) That is a critical consideration when assessing prejudice—and one the TCCA all but ignored. *See Strickland*, 466 U.S. at 696 (noting that a verdict "only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support").

**2.** Still, without the benefit of expert testimony, it is no surprise that the jury credited Kent's identification. "[D]espite its inherent unreliability, much eyewitness identification evidence has a powerful impact on juries." *Watkins v. Sowders*, 449 U.S. 341, 352 (1981) (Brennan, J., dissenting). Although "[c]ourts across the country now accept that certain factors can greatly affect the accuracy of eyewitness identification testimony," these factors "remain largely unfamiliar to the average person and often run counter to the beliefs of jurors." *Jones*, 262 A.3d at 1125-26. So, without expert assistance, jurors are *highly* likely to place undue weight on identifications—weight that decades of research show they do not deserve. *See, e.g., Smithers*, 212 F.3d at 312 n.1 ("Jurors tend to overestimate the

accuracy of eyewitness identifications because they do not know the factors they should consider when analyzing this testimony."). As this Court has recognized, the "counter-intuitive" nature of these reliability problems "can lead to devastating results." *Id*. Indeed, "eyewitness misidentification accounts for more false convictions in the United States than any other factor." *Ferensic*, 501 F.3d at 478.[15]

Expert testimony can—and does—guard against these dangers. Experts provide the jury with a "scientific, professional perspective" on the value of eyewitness identifications and the factors that affect their reliability. *Id.* at 477. Such testimony "serves to explode common myths about [a witness's] capacity for perception," *United States v. Moore*, 786 F.2d 1308, 1312 (5th Cir. 1986), and it thus may assist the jury with "weighing eyewitness evidence to draw the appropriate and necessary conclusions," *Jones*, 262 A.3d at 1128. An expert's perspective is often "vital" in cases that turn on eyewitness identifications precisely because it "help[s] jurors evaluate whether their beliefs about the reliability of eyewitness testimony are correct." *United States v. Bartlett*, 567 F.3d 901, 906 (7th Cir. 2009). Such testimony has a "powerful effect" on jurors by alerting them that their

---

[15] One analysis has found that eyewitness misidentifications were involved in 76% of the first 250 cases where wrongfully convicted people were exonerated by DNA evidence. *See* Brandon L. Garrett, Convicting the Innocent: Where Criminal Prosecutions Go Wrong 48-49 (2011).

everyday assumptions and intuitions about memory are not trustworthy. *Id.*; *see also Smithers*, 212 F.3d at 312 n.1 ("[M]any jurors' assumptions about how memories are created are actively wrong.").

**3.** Here, expert testimony would have had an especially powerful effect on the jury because almost *all* the individual factors known to reduce the reliability of eyewitness identifications were present. *See, e.g., Jones*, 262 A.3d at 1125 (listing factors that "can greatly affect the accuracy of eyewitness identification testimony"). As Dr. Neuschatz confirmed at the post-conviction hearing, Kent's identification of Clardy was cross-racial; the events at the body shop were complex and stressful; and the shooter was of course carrying a gun, potentially implicating "weapon focus." (Transcript, RE 10-17, PageID ## 2051-64.). Kent also testified that all the assailants were wearing head coverings; he admitted seeing only the side of the shooter's face; he testified he had previously seen Clardy around the neighborhood (potentially implicating "unconscious transference"); and he did not make the identification until weeks after the shooting. (*Id.* at PageID ## 2064-69.) In addition, the photo array procedure was marked by a failure to follow best practices. (*Id.* at PageID ## 2073-77.) The impact these factors have on reliability is well known to experts, but that impact "remain[s] largely unfamiliar to the average person." *Jones*, 262 F.3d at 1126. Given how weak the evidence of Clardy's guilt was to start, had an expert provided a "scientific, professional perspective" to the jury about the significance of

these factors, there is *more* than a reasonable probability that at least one juror would have had reasonable doubt. *Ferensic*, 501 F.3d at 477.

**4.** Indeed, other courts have found *Strickland* prejudice from the lack of expert testimony in cases involving similar factors, and even where there was far *more* evidence of the defendant's guilt. In *Nolan*, for example, *four* eyewitnesses identified the defendant at trial, two of whom testified they were familiar with him from around the neighborhood and were confident in their identifications. 956 F.3d at 76-79. Still, the Second Circuit held that the lack of an eyewitness expert prejudiced the defense. *Id.* at 82-83.

In *Jones*, the D.C. Court of Appeals found prejudice despite two eyewitness identifications, one of which was made by an observer who was not even a victim of the crime. 262 A.3d at 1128-30. The defendant's trial counsel had sought to undermine the eyewitnesses' credibility through cross-examination and closing argument. But the court still unanimously concluded there was a "reasonable probability that scientific testimony from an eyewitness expert, in the context of the other evidence at trial, would have created a reasonable doubt sufficient to forestall conviction." *Id.* at 1129.

This Court has itself twice held that excluding an eyewitness expert was not harmless to a defendant, and again despite evidence of guilt far stronger than the evidence against Clardy. *See Smithers*, 212 F.3d at 309-10 (three eyewitness identifications); *Ferensic*, 501 F.3d at 471 (two eyewitness identifications plus identification by a police officer from a sketched

composite).   While the test for harmlessness differs somewhat from the standard for showing *Strickland* prejudice, this Court said in *Ferensic* that it would have found the state court's decision unreasonable "*even if a traditional prejudice-based standard were the proper test*."   501 F.3d at 476 (emphasis added).  So *Smithers* and *Ferensic* certainly support Clardy's position, even if addressing a somewhat different issue.[16]

   **5.**   The State contends that the lack of expert testimony did not prejudice Clardy because his trial counsel still sought to impeach the identification in other ways, such as cross-examination and closing argument.[17]   But this Court has previously rejected that same contention, holding in *Ferensic* that "other means of attacking eyewitness identifications

_____

[16] The State emphasizes that the Court in *Ferensic* limited its holding to "the situation … where the record reflects the doubts of the jury itself as to the identification."  *Ferensic*, 501 F.3d at 484.  True, but the State also ignores that the evidence of the defendant's guilt there was far stronger than the evidence against Clardy here.

[17] The Court's unpublished decisions in *Dorch v. Smith*, 105 F. App'x 650 (6th Cir. 2004), and *Johnson v. Rapelje*, 2017 WL 8159213 (6th Cir. Sep. 28, 2017), provide the State little support.   In *Dorch*, the petitioner confessed to a cellmate, so the three eyewitness identifications were not the linchpin of the State's case.   Likewise, in *Johnson*, the petitioner had an obvious motive.  Plus, he failed to "put forward any facts which would suggest that counsel's decision not to call an expert witness was unreasonable."  2017 WL 8159213, at *3.

do not effectively substitute for expert testimony on their inherent unreliability." 501 F.3d at 481 (internal quotation marks omitted). As the Court explained there, without expert testimony, jurors will have "no basis beyond defense counsel's word to suspect the inherent unreliability" of identifications. *Id.* at 482. And counsel's "arguments," after all, "are not evidence." *Id.* at 477. Plus, jurors are understandably less likely to trust arguments and points made by the defendant's own counsel than they are testimony by an expert based on science and data. *See, e.g., Jones*, 262 A.3d at 1129 (rejecting the argument that counsel's allusions to "some issues surrounding eyewitness reliability" eliminated prejudice because counsel "did not provide the explicit and detailed testimony that an expert would likely offer"); *Ferensic*, 501 F.3d at 477 (explaining that an expert "would have informed the jury of *why* the eyewitnesses' identifications were inherently unreliable").

**6.** Otherwise, the State just incants that the evidence against Clardy was "incredibly strong"—and thus that prejudice was unlikely—because of Kent's "confidence" in the identification. Opening Br. at 9, 27-28, 36. That argument only shows why expert testimony was necessary. The State, like most lay jurors, assumes that Kent's confidence in the identification makes it more likely to be correct. Decades of empirical evidence shows the opposite. In fact, research has repeatedly shown that there is barely *any* correlation between a witness's professed confidence in an identification and

its accuracy—especially when, as here, the identification is not made immediately after the event.[18]  (Transcript, RE 10-17, PageID # 2070.)  That the State's own brief relies on the same kind of misconception that lay jurors often do shows exactly why an expert's perspective was crucial—and why it likely would have made a difference.[19]  As one court has emphasized, expert testimony is "the only method of imparting the knowledge concerning confidence-accuracy correlation to the jury."  *United States v. Brownlee*, 454 F.3d 131, 144 (3d Cir. 2006).

---

[18] *See also Young v. Conway*, 698 F.3d 69, 88-89 (2d Cir. 2012) (citing and summarizing scientific research showing that "eyewitness confidence is a poor postdictor of accuracy"); *Perry v. New Hampshire*, 565 U.S. 228, 264 & n.10 (2012) (Sotomayor, J., dissenting) (citing research supporting the conclusion that "confidence is a poor gauge of accuracy" for eyewitness identifications).

[19] The State makes a similar error when it relies on Kent's alleged familiarity with Clardy as a basis for concluding that his identification was especially reliable.  Contra the State's inference, confusing unknown people for familiar ones is *exactly* how witnesses often make mistakes.  This is the psychological phenomenon known as "unconscious transference."  (*See* Transcript, RE 10-17, PageID # 2067-69.)  *See also Jones*, 262 A.3d at 1125 (noting that "transference" is one factor that "can greatly affect the accuracy of eyewitness identification" and that it "occurs when a person seen in one context is confused with a person seen in another").

*     *     *

To establish prejudice, Clardy need only show "a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537-38.  He has more than made that showing.

## CONCLUSION

This Court should affirm the district court's judgment.

December 15, 2023

Respectfully submitted,

*s/ Scott D. Gallisdorfer*

Scott D. Gallisdorfer
**Bass, Berry & Sims PLC**
150 Third Ave. South, Suite 2800
Nashville, Tennessee 37201
Telephone: (615) 742-7926
scott.gallisdorfer@bassberry.com

Jessica M. Van Dyke
Jason M. Gichner
**The Tennessee Innocence Project**
700 Craighead Street, Suite 300
Nashville, Tennessee 37204
Telephone: (615) 581-7230
jessica@tninnocence.org
jason@tninnocence.org

*Attorneys for Petitioner-Appellee*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,993 words, excluding parts of the brief exempted by Rule 32(f).

The brief complies with the typeface and type-style requirements of Rule 32(a)(5) and (6) because it has been prepared in 14-point Palatino Linotype, a proportionally spaced typeface, using Microsoft Word.

December 15, 2023

*s/ Scott D. Gallisdorfer*
Scott D. Gallisdorfer

# DESIGNATION OF RELEVANT DOCUMENTS

Under Sixth Circuit Rules 28(b) and 30(g), Petitioner-Appellee designates the following filings in the district court record as entries relevant to this appeal:

| Record Entry No. | Description of Record Entry | PageID# |
|---|---|---|
| 1 | Habeas Petition | 1-84 |
| 10-1 | Indictment | 934-941 |
| 10-1 | Trial Minutes | 981-987 |
| 10-1 | Trial Judgment | 988-993 |
| 10-2 | Trial Transcript | 1004-1167 |
| 10-3 | Trial Transcript | 1168-1401 |
| 10-4 | Trial Exhibits | 1402-1482 |
| 10-5 | Trial Exhibits | 1483-1525 |
| 10-14 | Second Amended Petition for Post-Conviction Relief | 1734-1752 |
| 10-16 | State Post-Conviction Trial Court Order | 1980-1988 |
| 10-17 | Post-Conviction Hearing Transcript | 2003-2135 |
| 10-18 | Post-Conviction Hearing Transcript | 2136-2346 |
| 10-20 | Post-Conviction Hearing Exhibits | 2357-2456 |
| 10-21 | Clardy's Opening Brief (Tenn. Ct. Crim. App.) | 2457-2534 |
| 10-22 | Respondent's Response Brief (Tenn. Ct. Crim. App.) | 2535-2572 |
| 10-23 | Clardy's Reply Brief (Tenn. Ct. Crim. App.) | 2573-2599 |

| 12 | Answer to Habeas Petition | 2849-2873 |
|---|---|---|
| 18 | Clardy's Habeas Reply Brief | 2892-3922 |
| 25 | Report and Recommendation | 2931-2971 |
| 28 | Respondent's Objections to Report and Recommendation | 2977-2989 |
| 32 | Clardy's Response to Respondent's Objections to Report and Recommendation | 3021-3047 |
| 34 | Memorandum Opinion | 3064-3082 |
| 35 | Order Granting Habeas Relief | 3083 |
| 36 | Entry of Judgment | 3084 |
| 37 | Notice of Appeal | 3085 |
| 40 | Order Granting Stay of Judgment Pending Appeal | 3101 |
| 50 | Order Granting Release Pending Appeal | 3196 |

**CERTIFICATE OF SERVICE**

I certify that on December 15, 2023, I electronically filed this brief with the Clerk of the Court through the CM/ECF system. All participants in this case are registered CM/ECF users and will be served electronically through that system.

*s/ Scott D. Gallisdorfer*
Scott D. Gallisdorfer